**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Mark Harrison Perkins,<br><br>Plaintiff<br><br>v.<br><br>Anthony Demeyo et al.,<br><br>Defendants | Case No.: 2:12-cv-01242-JAD-VCF<br><br>**Order Granting<br>Partial Summary Judgment [Doc. 13]** |

This civil-rights action arises out of former detainee Mark Perkins's challenge of how officials at the Nye County Detention Facility ("NCDF") handled his mail.[1] Perkins sues Nye County Sheriff Anthony DeMeo and NCDF officers Lt. Dolfin and Sgt. Guthridge, who move for summary judgment.[2] The defendants' motion challenges only Perkins's claims arising from NCDF's mail policy under *Turner v. Safley*. I consider and grant summary judgment on Perkins's First Amendment challenge to the mail policy itself, which is liberally construed as counts one and three in the court's August 28, 2012, screening order.[3] This ruling does not fully resolve Perkins's

---

[1] Doc. 4 (complaint); *see also* Doc. 12 (address-change notice filed by Perkins).

[2] *See* Doc. 4 at 2; Doc. 13. I find this motion appropriate for resolution without oral argument. LR 78-2.
   I also liberally construe all pro-se motions and pleadings. *See Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 925 (9th Cir. 2003). Plaintiff was timely provided with the notice required under *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc), *Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

[3] *See generally* Doc. 13; Doc. 3 at 4; *Turner v. Safley*, 482 U.S. 78, 84 (1987).

1

claims. Perkins also raises an access-to-the-courts claim, construed as count two in the screening order, which defendants do not address in their summary-judgment motion.[4] Thus, I grant summary judgment only on the mail-policy counts, leaving the access-to-courts claim for further adjudication.

### Background

Perkins was booked into NCDF on March 7, 2012, as a pretrial detainee.[5] His first cause of action alleges that NCDF's mail policy, which permits only postcards and prohibits letters, violates his First Amendment right to free speech.[6] He alleges that he "could write only 198 words" on a standard three inch by five inch postcard;[7] on both sides of a letter-sized sheet, he could fit an average of 4,860 words.[8] He further alleges that, because of this policy, he never received a $495 paycheck his mother sent him, nor was it returned to her;[9] and when he filed a grievance, he was told that "the post office must be to blame."[10] In addition, Perkins never received postcards from two friends, and the cards were also not returned to the senders.[11]

Perkins's second claim alleges a violation of his Sixth and Fourteenth Amendment "right to access courts by writing [people] to assist [him] in legal work."[12] He further alleged that, since he dismissed his attorney, he lacks "access to current federal case law in [unintelligible] law library."[13]

---

[4] Doc. 3 at 6.

[5] Doc. 4 at 4. This summary of the parties' allegations and arguments is not a statement of factual findings.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* Perkins also references seemingly lost postcards sent from his "love[d] ones." *Id.* at 3.

[12] *Id.* at 5.

[13] *Id.* at 3, 5.

2

He also contends that "the jail law library is inadequate"[14] and he "can't collect [his] own evidence" without the help of family and friends.[15] He alleges he filed a grievance over the mail policy, which was denied, and he believes it is pointless to seek his family's aid because Sgt. Guthridge told him that legal mail with "so much as a note [written] on it" would be discarded.[16] He alleges that the discard process is subject to a deputy's whim and that NCDF has "no accountability for the mail."[17]

Perkins's third and final claim is for violation of his Fourteenth Amendment rights "by not providing a process of denial of each particular piece of censored mail."[18] He believes his $495 paycheck was thrown away; when he asked to write his employer about it, he was told that he had to inquire via postcard.[19] In addition, he alleges that deputies gave him conflicting answers about his mail.[20]

At NCDF, inmate mail is divided into two categories. Privileged mail is legal correspondence between a detainee and his attorney.[21] Non-privileged mail covers all other mail, including letters and packages.[22] Nye County processes approximately 75 to 100 pieces of mail for 150 inmates each day; during holidays, the amount of mail increases.[23] As attempts to smuggle contraband in non-privileged mail grew, the County had to redirect substantial staff time from

---

[14] Doc. 16 at 3.

[15] Doc. 4 at 5.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 6.

[19] *Id.*

[20] *See id.*

[21] Doc. 13 at 15–16.

[22] *Id.*

[23] *Id.*

3

inmate security to mail security.[24]  Glue on postage stamps and envelopes was used to smuggle heroin, phencyclidine (PCP), lyseric acid diethylamid (LSD), cocaine, body fluids, and other substances.[25]  Notepad bindings were hollowed for items like handcuff keys, weapons, and saw blades.[26]  All these items increase the risk of violence at NCDF, whether by direct use or because inmates trade contraband like money.[27]  As a result, the county sheriff created a mail policy that limits the kinds of inmate mail NCDF officials must handle.  The result was less smuggling, more prison-security monitoring, and more time to supervise personal visitation.[28]

Both Perkins and the defendants characterize the mail policy as a postcards-only policy.[29]  Nye County Assistant Sheriff Richard Marshall states in his sworn declaration that "[t]he Mail Policy provides that inmates can receive an unlimited number of mail pieces, without any restriction on the content of the communication, so long as the communication is written in ink on a common post card."[30]  He also states that the mail policy does not impact privileged mail "in any manner."[31]

A review of NCDF's mail policy itself indicates that, for the most part, inmates may only send and receive postcards.[32]  Payroll and cashier checks must arrive in an envelope with no other contents; personal checks are returned.[33]  The policy permits exceptions to the postcards-only rule

---

[24] *Id.*

[25] *Id.* at 16–17.

[26] *Id.* at 17.

[27] *Id.*

[28] *Id.* at 18.

[29] *See* Doc. 16 at 2; Doc. 13 at 18.

[30] *Id.*

[31] *Id.* at 15–16.

[32] *Id.* at 21.

[33] *Id.*

4

including packages preapproved by NCDF staff.[34] Legal mail apparently is not exempted, but is "handled according to Policy."[35] Only loose paper contents are accepted for legal mail—all "paper clips, staples or binders shall be removed first"—and drawings are prohibited on the outside of all mail. Nothing is specified about notes written on mailed sheets of paper, though pencil and certain types of ink are allowed, while other types of ink are specifically disallowed.[36] When mail is rejected, it may be returned to the sender with "a copy of the current mail policy."[37] If the mail is confiscated without being returned, NCDF will place it in the inmate's property until he is released.[38]

**Discussion**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[39] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[40] If reasonable minds could differ on material

---

[34] *Id.* These are many of the exceptions; this list is not exhaustive. *See id.*

[35] *Id.* Assistant Sheriff Richard Marshall states that "[t]he Mail Policy at issue did not relate to, govern, or affect, in any manner, the privileged mail received by an inmate." Doc. 13 at 16. The NCDF mail policy itself states that "Legal Mail will still be handled according to Policy," with the additional requirement that "all incoming Legal Must must be 'metered' or 'pre-printed' postage, [and] any paper clips, staples or binders shall be removed first." *Id.* at 21. This is one example of the many non-material factual conflicts between Assistant Sheriff Marshall's declaration, which typically aligns with the facts presented in *Covell v. Arpaio*, and NCDF's written mail policy. *Compare* Doc. 13 at 15–21 *with Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Ariz. 2009). These non-material factual conflicts do not, however, control the disposition of this summary-judgment motion. Whether legal mail falls under the policy, for example, does not change Assistant Sheriff Marshall's uncontroverted statement that legal mail must be received from counsel of record. Doc. 13 at 15–16. Perkins dismissed his lawyer, so he could not have received legal mail as defined by NCDF. *See* Doc. 4 at 3.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[40] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

5

facts, summary judgment is inappropriate because the purpose of summary judgment is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[41]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[42] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[43] The court's ability to grant summary judgment on certain issues or elements is inherent in Rule 56(a). Because summary judgment should "isolate and dispose of factually unsupported claims or defenses," the court's ability to grant partial summary judgment is inherent in Rule 56.[44]

**I.    Authentication**

The court may only consider properly authenticated, admissible evidence in deciding a motion for summary judgment.[45] "[U]nauthenticated documents cannot be considered in a motion for summary judgment."[46] Because the summary-judgment procedure is the pretrial functional equivalent of a directed-verdict motion, it requires the same caliber of evidence that would be admitted at trial.[47] To authenticate a document, the proponent must offer "evidence sufficient to

---

[41] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[42] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[43] *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

[44] *Celotex,* 477 U.S. at 323–24.

[45] Fed. R. Civ. P. 56(c); *Orr*, 285 F.3d at 773–74.

[46] *Id.* at 733 (citations omitted).

[47] *Anderson*, 477 U.S. at 251 (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983)).

support a finding that the matter in question is what its proponent claims."[48] It is insufficient to merely attach a document to a summary-judgment motion, opposition, or reply without affirmatively demonstrating its authenticity.

Documents may be authenticated in two ways: (1) the personal knowledge of a party who attests that the document is what it purports or (2) any other manner permitted by Federal Rule of Evidence 901(b) (which provides ten methods of authentication) or 902 (through self-authenticating documents that "require no extrinsic evidence of authenticity in order to be admitted").[49] As the Ninth Circuit articulated in *Orr v. Bank of America*, documents authenticated through personal knowledge must be attached to an affidavit signed by a person with personal knowledge about the document—such as the drafter or signer of a document, or the custodian of a document kept in the ordinary course of a business, depending on the type of document and its particular relevance—or properly authenticated deposition transcript in which the same foundation was laid.[50] This is the typical method for authenticating contracts, business records, policy manuals, and other documents. The court will not consider inadmissible hearsay in a declaration or otherwise.[51]

Defendants offer two evidentiary items to support summary judgment. The first is a declaration by Assistant Sheriff Marshall, who is responsible for the Nye County jail system's operations and is actively involved in implementing jail policies.[52] Because he addresses matters of which he has personal knowledge, I find his declaration proper for consideration. Assistant Sheriff

---

[48] *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532–33 (9th Cir. 2011) (quoting Fed. R. Evid. 901(a)).

[49] Fed. R. Evid. 902.

[50] *See Orr*, 285 F.3d at 773–74 ("documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'"); *see also* Fed. R. Civ. Pro. 30(f)(1) (requiring that depositions include reporters' certifications); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

[51] *Kim v. United States*, 121 F.3d 1269, 1276–77 (9th Cir. 1997).

[52] Doc. 13 at 15.

7

Marshall also authenticates Nye County's former and current mail policies.[53] Because he also testifies to these on personal knowledge, I find them authenticated.

Perkins submits his own evidence with his opposition: a letter regarding an envelope he sent, three photocopies of envelopes, and three NCDF grievances that he filed.[54] Because he offers nothing to properly authenticate these documents, I cannot consider them for summary-judgment purposes.

## II.   Claims

Defendants' summary-judgment motion is based solely on their defense of the NCDF mail policy.[55] I begin my analysis of their motion with that issue. Because Perkins's complaint combines various factual and legal theories in each claim, I organize my analysis of his claims by their factual predicates.

### A.   NCDF Mail Policy

Sheriff DeMeo, Lt. Dolfin, and Sgt. Guthridge agree that "[i]nmates enjoy a First Amendment right to send and receive mail" but argue that this right can be limited by regulations that reasonably relate to legitimate penological interests under the Supreme Court's ruling in *Turner*—and that NCDF's policy satisfies each element of the *Turner* test.[56] Perkins argues that the postcards-only policy "leaves very little way for inmates to meaningfully correspond [w]ith friends, family or [religious] organizations."[57] He also argues that NCDF staff are "[l]eft to arbitrarily decide what is, is not allowed as legal mail, and put little priority on delivery."[58] In short, he believes the

---

[53] *Id.* at 17, 20–21.

[54] Doc. 16 at 9–19.

[55] *See generally* Doc. 13.

[56] *See* Doc. 16 at 7–12.

[57] *Id.* at 3.

[58] *Id.* at 6.

8

mail policy is designed to punish inmates and is unrelated to a legitimate penological interest.[59]

Prison authorities have simultaneous duties to respect the Constitution and to control the penological climate for the needs of many prisoners. The Supreme Court declared in *Turner* that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."[60] Courts also recognize that they "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and, therefore, "accord deference to the appropriate prison authorities."[61] Free-speech rights are diminished in prisons, as compared to the nation at large, because they must yield to the need for creating a climate of consistency and control.[62] Thus, "an inmate retains those First Amendment rights not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."[63] The question is whether officials' disciplinary decisions are commiserate with their authority to control the prison climate.

Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[64] Courts consider four factors. First, *Turner* requires "a valid, rational connection between the prison regulation and the legitimate government interest put forth to justify it."[65] Second, judicial deference is particularly appropriate when inmates have alternative means of exercising the right at issue.[66] Third, courts

---

[59] *Id.*

[60] *Turner*, 482 U.S. at 84.

[61] *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).

[62] *Cf. Shaw v. Murphy*, 532 U.S. 223, 229 (2001).

[63] *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)) (internal quotation marks omitted).

[64] *Turner*, 482 U.S. at 89.

[65] *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)) (internal quotation marks omitted).

[66] *Id.* at 90 (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977); *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

must examine how the asserted constitutional right will impact guards, other inmates, and prison-resource allocation in general. Fourth, the court considers whether the policy is an exaggerated response. If there are no ready alternatives, courts take this as evidence of a prison regulation's reasonableness.[67] Obvious and easy alternatives—including ideas proposed by inmates—may show that a regulation is unreasonable, but courts are not to take this as a "least restrictive alternative" test.[68] The standard is reasonable relationship.[69]

*Turner* and the Supreme Court's subsequent ruling in *Shaw v. Murphy* do not permit courts to weigh the content of a prisoner's speech when he brings a First Amendment claim because enhancing or diminishing constitutional protection with a content-based evaluation would cause courts to overstep into the discretion of correctional officials.[70] The standard remains "unitary" and "deferential": whether the prison regulation is reasonably related to legitimate penological interests.[71]

**1. Rational connection**

The defendants argue that they satisfy the first *Turner* requirement because NCDF's mail policy aims to stop contraband smuggling.[72] Perkins counters that defendants "failed to show a compelling necessity for such a restrictive mail policy," making the policy arbitrary and irrational.[73]

The first *Turner* factor requires me to determine whether the governmental objective behind the mail regulations is legitimate and neutral, and whether the regulation and its objective rationally

---

[67] *Id.* (citations omitted).

[68] *See id.* at 90–91.

[69] *Id.* at 91.

[70] *Shaw*, 532 U.S. at 230 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

[71] *Id.* at 229.

[72] Doc. 13 at 8; *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

[73] Doc. 16 at 4 (internal quotation marks omitted).

10

relate.[74]  When "[t]he purpose of the mail policy is to eliminate or limit the mail smuggling of contraband," postcard policies have been specifically upheld against First Amendment challenges.[75]  Keeping banned items out of detainees' hands is a legitimate security interest.[76]  The mail policy also passes constitutional muster under the first prong because it is neutral on its face.  Nothing indicates that the mail policy is designed to suppress expression.[77]  In addition, courts in this circuit have permitted jails to limit the volume of inmate mail by, for example, "limit[ing] the number of pages an inmate may receive in each piece of correspondence."[78]  There is "a common-sense connection between a jail goal of reducing contraband and limiting the number of pages a particular piece of correspondence contains," which satisfies the first *Turner* factor because NCDF seeks to reduce or eliminate the dangerous contraband in its facility, including drugs, handcuff keys, and weapons.[79]

I note the parallels between this case and the District of Arizona's decision in *Covell v. Arpaio*.[80]  The Maricopa County Lower Buckeye Jail instituted a metered-postcards-only policy because inmates were smuggling contraband in mail: "(1) the back of postage stamps have contained various drugs, bodily fluids, and other unknown liquids and powders and (2) notepad bindings have

---

[74] *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).

[75] *Covell*, 662 F. Supp. 2d at1153 (citation omitted) (internal quotation marks omitted); *Prison Legal News v. Babeu*, 933 F. Supp. 2d 1188, 1203 (D. Ariz. 2013), *reconsideration denied*, CV 11-01761-PHX-GMS, 2013 WL 1832080 (D. Ariz. May 1, 2013), *aff'd*, 552 F. App'x 747 (9th Cir. 2014).

[76] *Covell*, 622 F. Supp. 2d at 1153.

[77] *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)).

[78] *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1110 (N.D. Cal. 2002), *aff'd*, 364 F.3d 1148 (9th Cir. 2004); *cf. Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004) ("Without violating the injunction [on the prison mail policy], legitimate restrictions could be adopted by any prison to meet its individual needs, for example page limitations, or a ban on recipes for pipe-bombs.").

[79] *Prison Legal News*, 933 F. Supp. 2d at1203; *Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999) (citations omitted) ("[W]hen the inmate does not present enough evidence to refute a common-sense connection between a prison regulation and the objective that government's counsel argues the policy was designed to further . . . and, presuming the governmental objective is legitimate and neutral . . . *Turner*'s first prong is satisfied.").

[80] *Compare Covell v. Arpaio*, 662 F. Supp. 2d 1146 (D. Ariz. 2009).

been hollowed to conceal contraband such as handcuff keys, metal strips or pieces, and saw blades."[81] In Nye County, a postcard policy was adopted because inmates were likewise "(a) using the backside of postage stamps on non-privileged mail, and the sealant/glue used to secure all sides of the envelopes or packaging to smuggle in drugs . . . body fluids, and unknown liquids and powders; (b) using note pads with their binding hollowed to [disguise contraband including] handcuff keys, metal strips that could be fashioned by inmates into handcuff keys and/or weapons, and even saw blades."[82] Like the *Covell* court, I conclude "that the reduction of contraband smuggling is a legitimate goal of the [Nye] County jails and that the mail policy is reasonably related to furthering that goal."[83] The first *Turner* factor favors the defendants.

**2. Alternative means**

The second factor asks whether "alternative means of exercising the right" are open to detainees.[84] The Supreme Court makes it clear that the right at stake must be read "sensibly and expansively."[85] Defendants argue that "[m]etered postcards, telephones, and jail visits may in Plaintiff's view be less than ideal means of communicating with his family and friends, but jail-

---

[81] *Id.* at 1149, 1153 ("[A] variety of drugs, including 'Black Tar' heroin, PCP, LSD, marijuana, cocaine, and powdered pills, are concealed under stamps.").

[82] Doc. 13 at 16–17 (Nye County Assistant Sheriff Richard Marshall's declaration) (stamps, envelope sealant, and packaging sealant were all used to "smuggle in drugs such as heroin, phencyclidine (i.e., 'PCP' or 'Angel Dust'), lysergic acid diethylamid ('LSD'), marijuana, cocaine, powdered or ground up pills of a wide variety of substances").

[83] *Covell*, 662 F. Supp. 2d at 1153. Despite the clear similarities between the facts in this case and *Covell*, and despite the extensive, word-for-word overlap between the arguments in this summary-judgment motion and *Covell*, the defendants provide only one "*see also*" cite to *Covell* in their briefs that almost appears to be a throwaway cite. *See* Docs. 13 at 7, 17 at 3 (providing identical legal standards). Given the persuasive authority that defendants apparently recognized in *Covell*, they would have done well to identify it more plainly.

[84] *Turner*, 482 U.S. at 90.

[85] *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989).

12

1 provided alternatives need not be ideal."[86] Postcards, calls, and personal visitation are all discussed
2 in Assistant Sheriff Marshall's declaration, though Nye County's policy appears less restrictive than
3 defendants indicate, because the county appears to allow stamped mail with metered postcards.[87]

4       Perkins presents no admissible evidence showing that he is barred from using alternative
5 communication methods. Instead, he argues that the personal visitation and telephone calls are not
6 feasible alternatives for his circumstances.[88] He explains that his mother lives in Mesa, Arizona,
7 which he believes is about 550 miles and a 10-hour drive from NCDF's location in Pahrump, Nevada.
8 This makes it "all but impossible for [a] working head of household to provide information or legal
9 research" through personal visits.[89] Perkins also writes that, because calling Mesa costs
10 "approximately $11.00 per call, this is also not [a] reasonable means to exchange legal [r]esearch."[90]

11       Perkins's objections implicitly acknowledge that alternatives are available. So long as NCDF
12 provides adequate visitation hours and calling access, along with a constitutional mail policy, it is
13 providing reasonable alternative means for prisoners to exercise their First Amendment rights.
14 NCDF is not responsible for the fact that Perkins's family lives far from the location where he is
15 detained. Perkins's complaint about the $11 telephone-call charge appears to be a concern about
16 collect calling, which is expensive and again is not the detention facility's responsibility. If the
17 detention facility itself is charging $11 per call, of course, that would raise entirely different
18 concerns, but Perkins offers no evidence of this.

19       Perkins's largest concern appears to be not the alternative means of communication but the
20 fact that these means are "not an 'available means' to exercise the right to have meaningful access to

---

[86] Doc. 13 at 9; *cf. Covell*, 622 F. Supp. 2d at 1154 (citation omitted) ("Metered postcards, telephones, and jail visits may in Plaintiff's view be less than ideal means of communicating with his family and friends, but jail-provided alternatives need not be ideal.").

[87] *See* Doc. 13 at 3 n.1, 4.

[88] Doc. 16 at 4.

[89] *Id.*

[90] *Id.*

13

court."[91] Access to the courts includes a right to access legal research.[92] I reach this issue later in this order, but detainees' access to law libraries is a separate question from whether NCDF's mail policy itself violates Perkins's constitutional rights. I find that the alternative means offered to him are adequate when combined with the NCDF mail policy.

**3. Adverse impact**

The third *Turner* factor requires me to examine how accommodating the asserted right will impact guards, other inmates, and prison-resource allocation.[93] This is because, in the correctional institution's "necessarily closed environment," most changes have a "ripple effect."[94] And where the liberty of others or the allocation of resources for preserving order is implicated, "courts should be particularly deferential to the informed discretion of corrections officials."[95]

The defendants supply evidence that attempts to smuggle drugs, weapons, and other contraband under the pre-postcard policy resulted in contraband transactions between inmates, jeopardized inmate and staff security, and required greater staff time for screening incoming mail.[96] Perkins contends without any supporting evidence that, if the NCDF staff accepts unbound papers and inspects them in the receiver's presence, the anti-smuggling goal will be "easily satisfied."[97] I find that the evidence of increased danger to inmates and staff caused by both the contraband itself and the staff time required to screen for contraband requires deference to NCDF's current mail policy. Thus, this factor also favors the defense.

**4. Obvious and easy alternatives**

---

[91] *Id.* (emphasis removed).

[92] *See, e.g.*, *Vandelft v. Moses*, 31 F.3d 794, 796 (9th Cir. 1994).

[93] *Turner*, 482 U.S. at 89.

[94] *See id.*

[95] *Id.*

[96] *See* Doc. 13 at 16–17.

[97] Doc. 16 at 4.

14

Under the fourth *Turner* factor, the court must determine whether the policy is merely an exaggerated response. If there are no ready alternatives to a regulation, courts take this as evidence of its reasonableness.[98] Obvious and easy alternatives—including ideas proposed by inmates—may show that a regulation is unreasonable, but courts are not to take this as a "least restrictive alternative" test.[99] The standard is reasonable relationship,[100] and the burden is on the plaintiff to show an alternative that accommodates his rights at minimal cost to security interests.[101]

Perkins argues that NCDF should have processed unbound papers in his presence.[102] This is almost what the new mail policy accomplishes: it generally requires postcards, but for legal mail, "loose paper contents are acceptable."[103] To qualify as legal mail, a mailing must come from "counsel of record."[104] This requirement is reasonably related to Nye County's goal of reducing or halting the flow of contraband through multi-page mailings.[105] The difficulty for Perkins is that, because he dismissed his lawyer on August 28, 2012, legal research sent to him is not from an attorney.[106] He offers no other alternative accommodations. And because NCDF's mail policy is reasonably related to reducing contraband and making NCDF safer, I find that this factor also favors the defendants.

In sum, all four *Turner* factors favor the constitutionality of NCDF's mail policy.

---

[98] *Turner*, 482 U.S. at 90–91 (citing *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

[99] *See id.* at 90–91.

[100] *Id.* at 91.

[101] *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993) (citing *Turner v. Safley*, 482 U.S. 78, 91 (1987)).

[102] Doc. 16 at 4.

[103] Doc. 13 at 21.

[104] *Id.* at 15–16.

[105] This policy is not targeted only at legal mail. Books and magazines must come directly from the publisher or a retailer. *Id.* at 21. Photographs, as another example, are limited to two per envelope. *Id.*

[106] *See* Doc. 4 at 3.

1 Accordingly, I find that the policy is reasonably related to legitimate penological interests and grant
2 summary judgment in defendants' favor on the sole issue for which they seek judgment: the
3 constitutionality of NCDF's mail policy.  Therefore, I grant summary judgment in favor of the
4 defendants on Perkins's first and third claims for relief.

**B.    Meaningful Access to the Courts**

Finding that the mail policy itself passes constitutional scrutiny, however, does not resolve all of Perkins's claims against these defendants.  Sheriff DeMeo, Lt. Dolfin, and Sgt. Guthridge fail to make any reference to Perkins's claim for violation of his right to meaningful access to the courts. The court declines to consider summary judgment on matters defendants did not raise in their motion.[107]  Accordingly, Perkins's second claim for relief survives.

**Conclusion**

Accordingly, and with good cause appearing,

It is hereby ORDERED that defendants' motion for summary judgment **[Doc. 13] is GRANTED**.  Summary judgment is hereby entered in favor of defendants on plaintiff's first and third claims for mail-policy violations of his First Amendment rights.

This order does not adjudicate plaintiff's second claim for denial of access to the courts.

DATED November 6, 2014.

_____
Jennifer A. Dorsey
United States District Judge

---

[107] *See generally* Doc. 13; *see, e.g.*, *Norse v. City of Santa Cruz*, 629 F.3d 966, 972 n.5 (9th Cit. 2010) ("In all cases . . . district courts should exercise special care in providing notice when contemplating granting summary judgment sua sponte . . . after the dispositive motion deadline has passed.").